The State of Ohio, Appellee, *v.* Jones, Appellant.
[Cite as State v. Jones (1973), 35 Ohio App. 2d 92.]

(No. 72AP-374—Decided May 1, 1973.)

*Mr. George C. Smith*, prosecuting attorney, *Mr. Miles C. Durfey*, for appellee.

*Messrs. Weiner, Lippe & Cromley*, for appellant.

STRAUSBAUGH, J. This is an appeal from a conviction of the defendant in the Court of Common Pleas of Franklin County for murder in the first degree and assault with intent to rob, resulting from the death of Donald Reed, owner and operator of the Henry Street Market in Columbus, Ohio.

The record indicates that, on June 25, 1971, about 5 p. m., defendant and two companions, Charles Carmichael and Joseph Sowell, drove to the home of Robert Booker to check on a party. In talking to Booker's sister, it was learned that Booker was at a pool hall nearby. Dorothy Booker identified the defendant and testified that she saw

the trio get something wrapped in a cloth from the trunk of a car and walk down the street in the direction of the Henry Street Market and later return and drive off.

Booker's sister, Geraldine Bumper, stated that she told the trio that her brother was at the pool hall, and testified as follows: "They went to the car and then they went down Delaware."

"Q. And did they get anything from the car?

"A. I seen a scarf and a black case."

She stated she thought they got it from the back seat.

Kenny Fuller testified that in the late afternoon of June 25, 1971, he was at his aunt's house located near the Henry Street Market and that he saw the three subjects as "they came between two houses and they went down the alley." He stated that as they came through the alley they looked around, the remaining portion of the sentence being properly stricken by the court. He stated that he looked down the alley to watch the boys because they were looking around. He stated that he heard a noise like a shot and went down there and saw them run from the market area.

He further stated that he recognized the boys and knew their names; and that they went to Central High and were in his homeroom, or classes. He identified Sowell as the person he had seen in the court hallway that morning and Jones as the defendant and that they were the men that went down into the store and the same men that came past him. He stated that he heard one tell Sowell "Go on" and that Sowell "went on down the street and the other two boys went between them houses again." He said that Sowell came so close to him that he knocked him down. He stated that he was a block and a half away when he heard the shot.

Harry Scholl, an 82 year old man, testified that as he backed his car out on Henry Street near the market he heard a shot, that he looked and saw three boys run out of the garage and up to the corner, all three of them laughing. He then entered the store and saw Mr. Reed laying back of the counter. He testified:

"[Mr. Reed was] choking like he was choking to death. So, I went back real quick and turned his head over and I wiped his mouth, kept wiping his mouth off."

Nancy Schree Terry, a fifteen year old Watterson High School student, testified that she lived adjacent to the market and worked there part time. She testified that on the day in question she quit work about 5 p. m., but that shortly thereafter her mother sent her back to the store for some purchases. As she was returning home she noticed three men, strangers to her, coming into the store from the alley. Upon her return home, the witness had forgotten the onions her mother had ordered so she went back to get them when she saw the three men coming from the store. She stated: "I had just started to step up on the sidewalk when I heard the shot. Then three men came from the store then."

She further testified that as they came through the door from the store one of them turned to her and, looking directly at her, said "What about her?" The other man replied "Come on." She said that as they went onto the sidewalk she walked immediately behind them into the store. She said that one of the three had a gun. She said that the man with the gun did not engage in the dialogue about her.

The witness further testified that when she went inside the store she saw the deceased "leaning against the cash register * * * which is on the left-hand side of the store." The witness stated that the victim looked down at his shirt which was bloody and "looked shocked and said 'Schree, the son of bitches shot me.'" She said that she then called the police.

She testified that Mr. Scholl then came in and was behind the counter. She said:

"[He was] trying to hold Don's head up because the blood was gushing out. He was going to suffocate if he wasn't already dead then."

She stated that other than the gun she did not see any of the three men carrying anything else. She stated that there was really no way that one could tell whether

anything in the store was moved because "we kept everything pretty well stocked, so if a minor thing was missing you couldn't really tell." She identified the defendant as one of the three men she saw.

The only testimony, aside from that of Sowell and the defendant, concerning what happened inside of the market at the time of the shooting, was testimony as to the dying statement of the deceased.

Sowell testified that inside of the store he bought a bag of potato chips and a pack of gum and started on his way out. The store was small, 32 feet by 17 feet. Carmichael was at the potato chip rack in the middle of the store and Jones by the pop rack looking at pop. He stated that when he got to the door he heard the shot. He looked back and saw Carmichael with the gun in his hand, a .32 or .45. He stated that he immediately ran out of the store. He stated that he saw the owner "going down." He stated Jones followed him running out of the store and Carmichael followed and caught up with them. Sowell denied that there was ever a conversation between the three of them relative to any robbery, and that the sole purpose for going into the store was to buy something.

Detective Edward Powell testified that the defendant was arrested early the next morning by the Columbus police, that he read and was read a statement advising him as to his constitutional rights, that the defendant stated that Paul Scott was his attorney, that the defendant refused to sign anything or to allow anything to be written down or to make any oral statement in front of any person other than Detective Edward Powell. The statement which was related as being that of the defendant at the police station was much the same as that told on the witness stand by Sowell with the addition that while inside the market "he told Charles Carmichael that it was not the right time."

At the end of the plaintiff's case the defense waived the jury and submitted the matter to the court for decision after resting its case without presenting any testimony. The court then made the following findings:

"(1) Charles Carmichael, Jodie Sowell and the Defendant met late in the afternoon of June 25, 1971. The three men were together continuously from approximately 5:00 P. M. on that date to 6:00 or 6:30 P. M. During this period the group, one of whom was carrying a case, walked to the Henry Street Market operated by Donald Reed, where, in a short visit inside the store, said Donald Reed was fatally wounded by the use of a .38 caliber pistol or revolver fired by Charles Carmichael.

"Donald Reed was alone in the store when the three men entered and had charge of and control over the cash register and any other money receptacles in the store.

"Immediately before or at the time of the shooting, the Defendant said to Charles Carmichael, 'This isn't the time.' After the shooting, all three men fled the store and scene, got into a car together and drove away.

"Immediately following the shooting, Donald Reed said to an arriving associate, 'The son of bitches shot me.'

"From all of the facts thus under consideration, the Court is of the opinion that a robbery was attempted, that the killing of Donald Reed occurred in the course of the attempted robbery and that the three men, including the Defendant herein, were joint participants.

"When two or more persons enter upon the execution of a common criminal enterprise, what each does in the execution of the common purpose is the act of all. Each is criminally responsible for an act done in furtherance of the common criminal enterprise whether intended by him or not, if such act might have been reasonably contemplated by him as probable or likely to result from an attempt to commit the crime intended; each is bound by the consequences naturally or probably arising in furtherance of the intended crime and in case of death is guilty of homicide."

Defendant's first assignment of error is that the verdict of the trial court is contrary to law and against the manifest weight of the evidence.

A careful review of the evidence indicates that the three men arrived at the Booker residence, and that after conversations with persons at the house the three remov-

ed something from the car. One witness described it as a black case and a scarf; another described it as an unidentified object wrapped in a scarf. The three proceeded to the Henry Street Market, some three blocks away, in the rain. A witness observed the trio emerge from between two houses and, after looking around, enter the Henry Street Market. The only testimony relating to what happened inside the market came from the testimony of one of the trio, Sowell, the statement of the defendant to Detective Powell at the police station, and the testimony as to the statement "Schree, the son of bitches shot me" by the dying market owner.

Nancy Schree Terry stated that outside the door, after the shooting, one of the men said "What about her?" Another one of the trio said "Come on," which would indicate some thought might have been given to disposing of her in some manner.

Another witness testified that as the trio ran down the street they were all laughing. The three men were next seen getting into their car and driving away at a high speed in an opposite direction from the Henry Street Market.

Defendant contends that "the circumstantial evidence fails to establish beyond a reasonable doubt the essential elements of the charges, such as motive, knowledge and participation."

As was stated in the fourth paragraph of the syllabus of State v. Huffman (1936), 131 Ohio St. 27:

"The intent of an accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person and it need not be. It must be gathered from the surrounding facts and circumstances under proper instructions from the court."

Although Sowell testified that the meeting of the trio was not preplanned and that the sole purpose of going to the store was to buy something, he could not know whether there was a plan to rob between Carmichael and the defendant.

The trial court had the duty to weigh the evidence and

determine the credibility of the witnesses. The evidence here is sufficient to satisfy reasonable minds of the guilt of the defendant, even though the evidence relating to motive is circumstantial. The first assignment of error is overruled.

Defendant's second assignment of error is as follows: "The statement made to Powell should have been suppressed being in violation of the V and XIV Amendments of the United States Constitution." A careful examination of the evidence reveals at the outset that the defendant was advised of his constitutional rights before the police ever started talking to him. The police showed the defendant the form entitled "Your Constitutional Rights." They let the defendant read it and then the police read the form to him, as follows:

"Before we ask you any questions you must understand your rights. You have the right to remain silent. Anything you say can be used against you in Court. You have the right to talk to a lawyer for advice before we ask you any questions and have him present with you during questioning. If you are unable to pay a lawyer, one will be appointed to you prior to any questioning, if you so desire. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer."

There was evidence that defendant Jones had a twelfth grade education even though he did not graduate from high school. The defendant indicated that he understood his constitutional rights. Following this, the defendant made an oral statement with regard to the homicide of the deceased. The testimony was that the statement was freely and voluntarily given with regard to the homicide.

We believe that there is sufficient evidence to support a finding that the defendant knowingly and intelligently waived his right to remain silent. The fact that the defendant refused to sign the waiver is not *per se* fatal to the use of the statement. The court, in *United States* v. *Crisp* (C. C. A. 7, 1970), 435 F. 2d 354, at page 358, stated: "[such

a waiver form] * * * supplies evidence of waiver, and a refusal to sign such a form may be a relevant factor in determining the validity of an asserted waiver in light of *Miranda* v. *Arizona*, 384 U. S. 436 * * *. *Miranda* does not, however, require such a written indication of waiver as the sole means of proving that fact. * * *''

Here, Jones was advised of his rights and indicated that he understood his rights. Also, he continued to talk to Detective Powell regardless of the absence of his attorney. Jones could have stopped the questioning at anytime by saying he did not want to talk to Powell anymore. However, he chose to continue, conditioned on the fact he would talk to Powell alone and on the condition Powell would write nothing down.

The defendant in *Klingler* v. *United States* (C. C. A. 8, 1969), 409 F. 2d 299 (certiorari denied, 396 U. S. 859), was advised both orally and in writing of his constitutional rights. Each time Klingler stated that he understood his rights. Thereafter, he selectively answered the questions asked by the Treasury Department's special investigator. The court held at 308;

"Klingler's refusal to sign the written waiver form without the presence of counsel is not fatal; *Miranda* does not require a written waiver, but only a waiver made 'voluntarily, knowingly and intelligently.' *Miranda, supra.* We believe that Klingler 'voluntarily, knowingly and intelligently' waived his right to counsel with regard to the admissions in question. That Klingler chose of his own free will to speak without the assistance of counsel should give him no cause for complaint."

The court, in affirming the conviction in *United States* v. *Van Dusen* (C. C. A. 1, 1970), 431 F. 2d 1278, stated at page 1280, that in the area of advising one of his rights, a refusal to sign a waiver followed by a willingness to talk may indicate a serious misunderstanding on the part of the accused, measurably increasing the burden of persuasion resting on the prosecution. However, the court held, at page 1281:

"[There] * * * the burden of persuasion was met,

Whatever other problems the appellant had, reading was not one of them. He was twenty-two. He had reached eighth grade level six years earlier. According to a doctor's report, he was of average intelligence but suffered from a high level of anxiety. He had, on an earlier occasion, seen and signed the warning form. He had time enough in which to read. The agents identified themselves and gave him the form with suitable explanation. He apparently read the form. He said he understood. His testimony, on the record, bespoke an articulate and competent person. He told the court that he understood that he could remain silent. He could be understood as feeling that it would help him to show that someone else was more to blame than was he. While this was a mistaken belief, we see no obligation on the investigating agents to tell him so. * * *''

VanDusen, like Jones, "testified that he thought that in the absence of his signature his statements could not be used against him." (*VanDusen, supra,* page 1280.) Jones had not just an eighth grade education, but a twelfth grade education; Jones could read and seemed to be of average intelligence, as was VanDusen.

Detective Powell stated that the defendant refused to sign the constitutional rights waiver and indicated that he would not speak or admit anything which was written down, and that detective Powell ceased writing and wrote nothing after the defendant made that request and threw the scratch paper away that he had started to write upon. Detective Powell testified that the defendant did not at anytime indicate he wanted to see an attorney, although he mentioned that Paul Scott was his attorney and that before he signed anything he definitely wanted to talk to Mr. Scott. Detective Powell indicated that although he personally did not try, his office attempted to call Paul Scott, and the defendant made no attempt to call at all even though he was given an opportunity to use the phone after he was slated.

Although Jones was specifically advised of his right to have an attorney present, he voluntarily chose to waive this right by engaging in a discussion with Powell, which

was conditioned upon no one else being present and the conversation not being reduced to writing. In *Klingler, supra* at 308, the court quoted with agreement a statement made by the court in *Mayzak* v. *United States* (C. C. A. 5, 1968), 402 F. 2d 152, as follows:

"* * * *Miranda* * * * does not require that attorneys be producible on call, or that a Miranda warning include a time table for an attorney's arrival. * * * To so hold would be to allow a defendant to use his right to an attorney as a weapon against his custodians. He would simply argue if you will not furnish me an attorney now, even though I am told that I can remain silent, I will talk and after talking object to my words going into evidence. This argument is both hollow and specious. * * *"

Jones could have effectively exercised his rights by remaining silent, but he did not. After being advised of his rights, Jones continued the discussion. The defendant, not the police, created the circumstances that constituted an effective waiver.

We find no abuse of discretion on the part of the trial court in holding that there was no denial of the right to counsel and that the defendant had waived his right to remain silent. There was evidence that the defendant made a knowing and intelligent waiver of his right to counsel and remained silent. The only right which defendant retained in giving his oral statement was that he would remain silent should Detective Powell write down what he was saying, or if a witness were called in, as evidenced by the entrance of Detective Lt. DeWeiss into the room. We find nothing which would prohibit the defendant from retaining certain of his constitutional rights while waiving others. This is exactly what defendant did.

Here, there is no contention that the defendant requested the right to communicate with his attorney or any attorney and was denied that right. R. C. 2935.20 does not require that the police affirmatively offer telephone facilities to a person arrested. The defendant at no time during the interview indicated that he wished to remain silent. Rather, the defendant made certain stipulations as to cir-

cumstances under which he would talk. At anytime during the interrogation, the defendant could have invoked his right to remain silent and such right would have to have been honored. The defendant did not invoke such right and therefore cannot be heard now to complain. The second assignment of error is overruled.

Defendant's third assignment of error is as follows: "The trial court was in error by not dismissing the case. If in fact there was a conspiracy, the conspiracy was terminated by the defendant." Defendant, here, seeks to use a statement, the admission into evidence of which he so strenuously objects to, in the second assignment of error, as a double-edged sword to excuse his participation in the commission of the robbery. He attempts to prove such non-participation through defendant's statement. "This is not the right time" and his act of leaving before the act of shooting. We do not find that the statement of defendant at the scene of the killing, assuming such statement was made, was sufficient to effect a withdrawal of the defendant from participation in the crime. We hold that it was not an abuse of discretion on the part of the trial court to find that such statement did not act as a withdrawal.

Considering all of the circumstances and evidence surrounding the actions of the trio, it may be concluded by the trier of the facts that there was no withdrawal of defendant's participation in the action. The third assignment of error is overrued. The judgment is affirmed.

*Judgment affirmed.*

REILLY, J., concurs.
WHITESIDE, J., dissents.

WHITESIDE, J., dissenting. Because I am unable to concur in the overruling of the second assignment of error, I must dissent.

While I agree that the inculpatory statement made by defendant during the in-custodial interrogation was voluntary in the traditional sense—the burden being upon defendant to prove that it was involuntary—I do not believe

that the state has sustained its burden of establishing that defendant knowingly, intelligently and voluntarily waived his right not to make the statement. The distinction to which I refer is well set forth in *State* v. *Kassow* (1971), 28 Ohio St. 2d 141, the first, third and fourth paragraphs of the syllabus of which read as follows:

"1. The rule of *Miranda* v. *Arizona* (1966), 384 U. S. 436, which requires proof of the voluntary waiver of the Fifth Amendment *right not to respond* to police questioning, exists independently of, and in addition to, the historic rule of evidence that an accused's statement may not be used against him in any way if the *statement itself* is proved to be involuntary, *i. e.*, untrustworthy when tested by traditional legal standards. *Harris* v. *New York* (1971), 401 U. S. 222, 28 L. Ed. 2d 1; *Spears* v. *State* (1853), 2 Ohio St. 583.

"3. Upon the trial of the issues raised by a pre-trial motion to suppress a statement claiming that the statement was compelled by mistreatment, threat of disadvantage, or hope of reward, the burden is upon the accused to prove his claim in that respect. *Rufer* v. *State* (1874), 25 Ohio St. 464.

"4. Prior to the use of an in-custodial statement, given in response to police interrogation, against the accused in its case in chief, the state has the burden of establishing that the accused knowingly, intelligently and voluntarily waived his Fifth Amendment right not to make the statement. *Miranda* v. *Arizona* (1966), 384 U. S. 436."

Of course, the controlling rule that must be applied is that established by *Miranda* v. *Arizona* (1966), 384 U. S. 436. Whether we agree or disagree with the *Miranda* rule, we are bound to follow it. *Miranda* has become so well known as to be almost a part of our everyday language of society. The *Miranda* rule was well summed up in *Harris* v. *New York* (1971), 401 U. S. 222, 224, as follows:

"*Miranda* barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel." *Miranda* itself stated the rule, at page 444:

"* * * the prosecution may not use statements, wheth-

er exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. * * * Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. * * *''

The Supreme Court stated further in *Miranda,* at page 470:

''An individual need not make a preinterrogation request for a lawyer. While such request affirmatively secures his right to have one, his failure to ask for a lawyer does not constitute a waiver. No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings we here delineate have been given. * * *''

The court stated further, at page 475:

''If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. * * *

''An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. * * * Moreover, where in-custody interrogation is invol-

ved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated."

The Supreme Court restated the rule at page 479, as follows:

"He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."

Thus, in addition to the traditional right to remain silent, *Miranda* affords the right to consult with counsel prior to interrogation and to have counsel present during interrogation. Unless such right to counsel is afforded or waived, *Miranda* requires the exclusion of statements made without the presence of counsel.

The issue with which we are confronted is whether the state has sustained its heavy burden of proving that the defendant knowingly and intelligently waived his right to counsel pursuant to *Miranda*.

Defendant was advised of his rights in a proper manner as set forth in the majority opinion. However, he immediately thereafter was asked to sign the following waiver:

"I have read the statement of my rights shown above and I understand what my rights are and I'm willing to answer questions and make a statement. I understand and know what I am doing. No promise or threats have been made to me and no pressure of any kind has been used against me."

Defendant refused to sign the waiver without first consulting with his attorney. While *he did make* statements during the interrogation, he objected to the taking of notes by the officer conducting the interrogation unless he could, first, talk to his attorney. The officer's testimony in this regard was, in part, as follows:

"* * * He stated, in essence, that he would not sign anything and would not write anything down on paper until he talked to his attorney * * *.

"* * *

"* * * He indicated that he would make a statement, but he would not sign a rights waiver, for the matter, would not sign anything, would not put anything down on paper."

This is not inconsistent with defendant's testimony that he understood that if he signed a rights waiver and if information were written down it could be used against him, but that he did not understand that what he was saying orally could be used against him.

Defendant refused to sign a waiver without first consulting with an attorney. One of the rights that defendant was asked to waive was the *Miranda* right to counsel during interrogation. Although such a waiver need not necessarily be in writing, *Miranda* holds that there can be no effective waiver of the right to counsel during interrogation unless it is "specifically made" after the *Miranda* warnings are given. Here, there is no evidence of a specific waiver of the right to counsel during interrogation. Rather, we are asked to imply such a waiver from the facts that defendant did not specifically request an attorney to be present and continued to make a statement, after he refused to sign a written waiver of his right without first consulting with an attorney. But, *Miranda* also holds that "his failure to ask for a lawyer does not constitute a waiver" and that "a valid waiver will not be presumed simply from the silence of the accused after warnings are given."

Two cases from other jurisdictions are of particular significance inasmuch as they both involve situations where the defendant refused to sign a written waiver of his rights without first consulting with his attorney but the interrogation continued and a statement was obtained. In *United*

*States* v. *Nielsen* (C. C. A. 7, 1968), 392 F. 2d 849, it is stated at page 853:

"There can be no question that when the defendant in the instant case refused to sign anything until he saw his attorney, he indicated a desire to remain 'silent.' * * *

"Here the defendant's refusal to sign the waiver form, followed by an apparent willingness to allow further questioning, should have alerted the agents that he was assuming seemingly contradictory positions with respect to his submission to interrogation. Instead of accepting the defendant's equivocal invitation, the agents should have inquired further of him before continuing the questioning to determine whether his apparent change of position was the product of intelligence and understanding or of ignorance and confusion. However, no further inquiry took place. In the absence of such an inquiry, we are compelled to conclude that the defendant's negative responses to the questions asked him were not made after a knowing and intelligent waiver of his rights. * * *"

The second case is a decision of the Supreme Court of Indiana in *Brown* v. *State* (1971), 256 Ind. 558, 270 N. E. 2d 751. In that case it is stated at page 753:

"Appellee argues that although appellant at first refused to waive his rights, the fact that he later confessed was an implicit waiver of those rights. A heavy burden rested on the appellee at trial to show a voluntary and knowing waiver by appellant. * * *

"We hold that the appellee did not carry this burden. After appellant's explicit refusal to waive his right to have an attorney present and to remain silent appellant should not have been questioned any further. * * *

"It is clear that appellant indicated his desire to talk to an attorney before waiving his rights. Deputy Ferguson testified that appellant refused to sign a waiver of rights because he did not want to sign anything until he had had a chance to talk to an attorney."

The written waiver, when obtained, constitutes evidence of waiver. A refusal to sign a waiver before first consulting with an attorney is a relevant factor to be considered in determining the validity of an asserted waiver.

Where there is an express refusal to sign a written waiver until an attorney is consulted, to be consistent with *Miranda*, the evidence of a subsequent oral waiver must be express and cannot be implied merely from the fact that interrogation continued after such refusal and a statement was obtained.

Another case of significance is *United States* v. *Phelps* (C. C. A. 5, 1971), 443 F. 2d 246, wherein it is stated, at page 249:

"In the present case we are unable to tell whether Phelps validly waived his right to remain silent or not. It is clear that after Phelps refused to sign the waiver, the officers should have ceased interrogating him. It is also clear that subsequent conversation did occur between the investigators and Phelps. The hearing on the motion to suppress does not reveal, however, whether the subsequent questions by the officers were the result of voluntary conversation initiated by Phelps or whether these questions were initiated by the officers themselves without any instigation by Phelps. If the former situation obtains, then under our decision in *Hopkins,* Phelps' subsequent answers would be admissible. If the latter situation obtains, however, *Miranda* compels that we hold the answers inadmissible. * * *"

In *United States* v. *Van Dusen* (C. C. A. 1, 1970), 431 F. 2d 1278, although the court held that the prosecution had sustained his burden of proving a knowing and intelligent waiver, the court stated, at page 1280:

"* * * In the delicate area of advising one of his rights, where testimony is often conflicting, the act of refusing to sign a waiver is concrete and indisputable. When such an act occurs, followed by a willingness to talk, this is a signal of some quirk of reasoning which may simply be a dislike of affixing a signature to any document but which may be more. It may indicate a serious misunderstanding on the part of the accused. In such a succession of events, we wish to make it clear to the courts and prosecutors in this circuit that the burden of persuasion resting on the prosecution measurably increases. It would, we think, be folly to try to cast this principle in the form of

a specific required practice. Indeed, were we so to rule, a suspect could, by refusing to sign and subsequently talking freely, enjoy the luxury of an immunity bath at no price at all."

Also pertinent is *United States* v. *Priest* (C. C. A. 5, 1969), 409 F. 2d 491, wherein the situation is described by the court, at 492, as follows:

"* * * It is conceded by everyone concerned that at this point Priest said he did not want to sign the form until he had consulted with an attorney. This obvious request for an attorney was ignored, the interrogation proceeded, and in due course a confession was obtained."

The court further stated, at page 493:

"* * * Situations to which *Miranda* applies, however, are governed not by the general test of voluntariness but rather by the more precise test of whether the constitutionally required warning was given and, if given, whether the rights set out by that warning were knowingly, intelligently, and voluntarily waived. Where there is a request for an attorney prior to any questioning, as in this case, a finding of knowing and intelligent waiver of the right to an attorney is impossible. * * *"

On the other hand, *Klingler* v. *United States* (C. C. A. 8, 1969), 409 F. 2d 299, appears to support the majority herein and to be inconsistent with the above authority. In that case it is stated, at page 308:

"Klingler again answered that he understood his rights. He read the printed form, but refused to sign it on the ground that he didn't 'sign anything without a lawyer.'
"* * *

"In this case, Klingler was advised both orally and in writing of his constitutional rights. He stated that he understood his rights and he selectively answered Cronin's questions. Klingler's refusal to sign the written waiver form without the presence of counsel is not fatal; *Miranda* does not require a written waiver, but only a waiver made 'voluntarily, knowingly and intelligently.' * * * We believe that Klingler 'voluntarily, knowingly and intelligently' waived his right to counsel with regard to the admissions in question. That Klingler chose of his own free will to

speak without the assistance of counsel should give him no cause for complaint.''

Defendant also contends that his statements should not be admissible because he was not, immediately upon his indication of a desire to consult with an attorney, afforded facilities to do so by the police. R. C. 2935.20 does provide, in pertinent part, that:

''After the arrest, detention, or any other taking into custody of a person, with or without a warrant, such person shall be permitted forthwith facilities to communicate with an attorney at law of his choice who is entitled to practice in the courts of this state, or to communicate with any other person of his choice for the purpose of obtaining counsel.

See, also, R. C. 2935.14 which requires facilities by which an accused may communicate with an attorney to be ''speedily permitted'' prior to the time a person arrested for a felony is ''confined or removed from the county of arrest.'' In the unreported decision in State v. Purdie, Court of Appeals for Franklin County, No. 9793, rendered January 12, 1971, this court held that ''R. C. 2935.20 does not require that the police officers affirmatively offer such facilities to a person arrested.'' However, when a person arrested indicates a desire to consult with an attorney, he must be ''permitted forthwith facilities to communicate with an attorney.'' The interrogation here continued for an hour and at least thirty minutes after defendant's request. He was not denied the right to consult with an attorney, and did not expressly request facilities to communicate with his attorney. R. C. 2935.20 does not condition its operation upon such a request. However, where, as here, an accused indicates a desire to consult with an attorney before he signs a waiver of his Miranda rights, the fact that the police do not forthwith furnish facilities to the accused for such a communication with the attorney is a relevant factor to be considered in determining whether or not there has been a knowing, intelligent and voluntary waiver of the Miranda right to consult with counsel prior to interrogation. The uncontradicted testimony of defendant herein is that he was not afforded facilities to communicate with an attorney until two days after the interroga-

tion. The officer testified that defendant was not given an opportunity to use the telephone prior to interrogation, apparently because he did not specifically ask to, but was given such an opportunity "after he was slated." The statement of the officer, in response to a question whether he attempted to call the attorney specified by defendant, that "our office did * * * I personally did not" is entitled to little if any weight. First, it is strictly hearsay. There also is no indication as to when this "attempt" was made or whether it was successful. The officer gave no indication that the "attempt" was made at his request prior to the interrogation, or that defendant was at anytime made aware of such "attempt."

Of course, even where a statement is obtained in violation of *Miranda*, its use at trial may be harmless error. As stated in the third and fourth paragraphs of the syllabus of *State* v. *Edgell* (1972), 30 Ohio St. 2d 103:

"3. The use of a statement against an accused taken in transgression of *Miranda* may be found to be harmless error under the rule of *Chapman* v. *California* (1967), 386 U. S. 18.

"4. Where the unchallenged evidence against an accused is so overwhelming that a conviction can be said to be inevitable beyond a reasonable doubt a *Miranda* transgression is harmless."

Part of the statement of defendant introduced into evidence might be so found. The testimony that defendant admitted being in the Henry Street Market at the time of the shooting and that he was in the rear of the store and started towards the front of the store when he saw Carmichael reach in his pocket and that when he was in the area of the front door he heard a shot and turned around and saw Carmichael with a gun in his hand might all constitute harmless error in this case. However, the following cannot constitute harmless error:

"He stated that while inside the market he told Charles Carmichael that it was not the right time."

The clear inference from this statement by defendant is that there was some plan of action between him and Carmichael which defendant felt should be postponed. The

prosecutor in his argument before the trial court made repeated reference to this statement. Furthermore, and more important, the trial court, in its decision made specific reference to the statement as one of the facts proven, stating:

"Immediately before or at the time of the shooting, the Defendant said to Charles Carmichael, This isn't the time. * * *"

The trial court further stated:

"From all of the facts thus under consideration, the Court is of the opinion that a robbery was attempted, that the killing of Donald Reed occurred in the course of the attempted robbery and that the three men, including the Defendant herein, were joint participants."

Furthermore, the third member of the group, Sowell, after specifically being granted immunity from prosecution, testified, uncontradicted except by circumstantial evidence and the alleged statement by the defendant herein, on behalf of the state that there was never a conversation between the three relative to any robbery, that his sole purpose in going to the store was to buy something, and that there was no preplanned meeting between the three. Under such circumstances, it cannot be said that the unchallenged evidence against defendant "is so overwhelming that a conviction can be said to be inevitable beyond a reasonable doubt." The introduction of the statement was prejudicial and was clearly one of the facts which prompted the trial court to make a finding of guilty.

I concur with the majority that the first and third assignments of error should be overruled. The evidence was sufficient to permit reasonable minds to make a factual finding in weighing the evidence that defendant was guilty. The statement "this isn't the time" attributed to the accused does not indicate a withdrawal from a prearranged plan but, rather, at most, indicates a desire that the execution of such prearranged plan be postponed.

However, I find that the second assignment of error is well taken and should be sustained. Accordingly, I would reverse the judgment of the Court of Common Pleas and remand this case to that court for a new trial.